UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ANTHONY ENGLISH | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04 C 5534 |
| | ) | |
| DR. KEVIN SMITH, DR. LAWRENCE NGU, BARBARA MILLER, DR. PARTHA GHOSH, DR. FAISAL AHMED, DR. ADRIAN FEINERMAN, PENNY GEORGE, | ) ) ) ) ) | Judge Rebecca R. Pallmeyer |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Anthony English, a state prisoner currently incarcerated at Menard Correctional Center ("Menard"), brought this civil rights action under 42 U.S.C. § 1983. Plaintiff claims that, after he suffered a broken ankle, doctors and administrators at Stateville Correctional Center ("Stateville") and Menard violated his Eighth Amendment rights by acting with deliberate indifference to his serious medical needs. Defendants are Dr. Lawrence Ngu, staff physician at Stateville; Drs. Kevin Smith and Partha Ghosh, medical directors at Stateville; Barbara Miller and Penny George, Health Care Unit Administrators at Stateville; and Drs. Faisal Ahmed and Adrian Feinerman, medical directors at Menard. Defendants seek summary judgment, arguing that the undisputed facts show that they did not act with deliberate indifference and, alternatively, that Plaintiff did not exhaust administrative remedies prior to bringing suit. For the reasons discussed below, the motions for summary judgment are granted.

## FACTS

The facts are drawn from the Plaintiff's and the Defendants' Local Rule 56.1 filings.[1] On

---

[1] Three groups of defendants have each filed a summary judgment motion accompanied by a Local Rule 56.1 filing: Defendants Barbara Miller and Penny George filed "Local Rule 56.1 Filing" (hereinafter "Miller 56.1"); Defendants Drs. Partha Ghosh, Kevin Smith, and
(continued...)

June 10, 2002, Plaintiff injured his ankle during a basketball game at Stateville, where he was incarcerated. (Miller 56.1 ¶ 9.) Within a couple of days, Plaintiff was taken to the University of Illinois at Chicago Hospital ("UIC"), where he was diagnosed with an ankle fracture with subluxation–in other words, a minor dislocation. (Ghosh 56.1 ¶ 8.) UIC doctors performed surgery on his ankle on June 21 and placed Plaintiff in a short leg cast. (*Id.* ¶ 9.) The following day, Plaintiff was returned to Stateville, where he recuperated at the Stateville Health Care Unit ("HCU"). (*Id.* ¶ 10.) On July 15, Plaintiff met again with the doctors at UIC, who recommended that he return in three weeks to determine whether the cast could be removed. (*Id.* ¶ 11.) Two days later, Plaintiff was discharged from the Stateville HCU and given a permit for a pair of crutches and another permit for three months for a low bunk and a low gallery.[2] (*Id.* ¶ 12.)

On July 16, 2002, Stateville Medical Director, Defendant Dr. Smith, signed a form approving the UIC doctor's recommendation that he return to UIC for a follow-up appointment. Nevertheless, for unexplained reasons, Plaintiff was not brought back to UIC for the recommended follow-up appointment. (Ex. 3 to English 56.1(b).) The medical records department at Stateville was responsible for scheduling outside appointments, although the parties dispute whether a separate form from a Stateville physician was required before the department would schedule such an appointment. (Ghosh Resp. to Pl.'s Statement of Material Facts ¶ 10.) It is also unclear from the record whether the July 16, 2002 form, or any other such form, was ever sent to the medical records department.

---

[1](...continued)
Lawrence Ngu filed "Statement of Material Facts" (hereinafter "Ghosh 56.1"); and Defendants Drs. Adrian Feinerman and Faisal Ahmed filed "Statement of Material Facts" (hereinafter "Feinerman 56.1").

In addition, Plaintiff—who is represented by appointed counsel–has filed "Anthony English's Local Rule 56.1(b) Filing (hereinafter "English 56.1(b)").

[2] "Low gallery" apparently refers to a low floor of the prison, so a low gallery permit entitled Plaintiff to have his cell on a lower floor. (*See* English Dep. 17:23-24, Ex. K to Ghosh 56.1.)

Stateville medical staff included medical technicians ("med techs") who were responsible for making rounds among the prisoners in the general population and scheduling prisoners for "sick call," permitting them to be seen by a prison doctor. (English 56.1(b) at 27.) While his ankle remained in a cast, Plaintiff claims that he made repeated requests to one or more med techs to be placed on sick call in order to have his cast removed, and that med techs informed him that he was on the schedule. (*Id.*) Plaintiff was not in fact seen by a doctor during this time, however, and his cast was not removed until the HCU staff finally removed it on November 26, 2002, nearly four months after the date on which UIC doctors had recommended he return for a reevaluation. (Miller 56.1 ¶ 14.) Defendant Dr. Ngu, a staff physician at Stateville, had some interaction with Plaintiff while Plaintiff remained in the HCU in June and July 2002, but did not see him at all between Plaintiff's discharge from the HCU on July 17 and November 26, when Plaintiff had his cast removed. (English 56.1(b) at 26; Ghosh 56.1 ¶ 29.)

Defendant Barbara Miller was the HCU Administrator at Stateville from 1994 to January 2003.[3] (Miller 56.1 ¶ 2.) In that position, Miller handled administrative matters for the infirmary and the med techs (*Id.* ¶ 29), including such issues as "not enough time for lunch, too much work, union issues, [if] somebody spoke unprofessionally to them, [and] things like that." (Miller Dep. 8:22-24, Ex. B to Miller 56.1.) She also regularly made rounds in the HCU infirmary "to monitor safety and sanitation" (Miller's Resp. to Pl.'s Statement of Material Facts ¶ 4), but played no role in any medical decisions made by those personnel. (Miller 56.1 ¶ 19.) Plaintiff claims that on the day his cast was removed, Miller "[had] the med techs go check the cellhouses to see if anybody else had casts on."

---

[3] Defendant Penny George held the same position from January 2003 to May 2003. (Miller 56.1 ¶ 3.) This five-month period occurred after Plaintiff's case was removed and before his transfer to Menard. There is, therefore, no basis for a claim against her for her participation in either of those incidents, and Plaintiff does not oppose the dismissal of Defendant George from the lawsuit. (English's Consol. Opp'n. to Defs.' Mots. for Summ. J. (hereinafter "English's Opp'n.") at 2 n.1.)

(English Dep. 81:8-10, Ex. K to Ghosh 56.1), but Miller disputes this assertion.[4] (Miller Dep. 24:6-20, Ex. B to Miller 56.1.)  Miller also did not handle med tech requests that an inmate be placed on sick call; the medical records department and its supervisor did.  (Miller 56.1 ¶ 31.)  Plaintiff has not named any member of the medical records department or any medical technician as a defendant.

At some point before his cast was removed in late November, Plaintiff claims, he filed an emergency grievance with the Warden to have his cast removed, but the grievance was returned to him on the ground that it was not an emergency.  (English 56.1(b) at 27.)  Plaintiff also claims that he then mailed the returned grievance to the counselor on his cell-block.  (*Id.*)  None of the parties have presented any records of Plaintiff's requests to go on sick call, the sick call log itself, or of the two grievances he claims to have filed.

After his cast was removed, Plaintiff began a course of physical therapy, attending eighty-five sessions between December 2002 and August 2003.  (Ghosh 56.1 ¶ 16.)  (The record does not reveal which medical personnel, if any, directed or supervised this physical therapy regimen.)  Also, during this time, he returned to UIC on at least four separate occasions for follow-ups, as he continued to experience pain and stiffness in his ankle.  (*Id.* ¶¶ 17-20.)  Each UIC follow-up was approved either by Smith or by Defendant Dr. Ghosh, who succeeded Smith as the medical director at Stateville in May 2003.[5]  (Smith Aff. ¶ 10, Ex. E to Ghosh 56.1; Ghosh Aff. ¶¶ 4-6, Ex. D to Ghosh 56.1; Ghosh 56.1 ¶ 4.)  These follow-ups revealed that Plaintiff continued to have limited range of motion in his ankle, osteoporosis from disuse, and degenerative joint disease of the ankle.  (*Id.*)  Plaintiff's expert, Dr. Thomas Limbird, suggests that these lingering problems may have been

---

[4] The court will presume that Plaintiff observed the med techs visiting the cellhouse for this purpose; he has not, however, offered a non-hearsay basis for his claimed knowledge that they did so at Miller's direction.

[5] Specifically, Smith approved one referral to UIC on April 3, 2003. (Smith Aff. ¶ 10, Ex. E to Ghosh 56.1.)  Ghosh approved three referrals to UIC after he became medical director at Stateville, on May 19, June 9, and August 11.  (Ghosh Aff. ¶¶ 4-6, Ex. D to Ghosh 56.1.)

caused or exacerbated by the amount of time Plaintiff's ankle remained in a cast, stating that the "length of immobilization experienced by [Plaintiff] has a detrimental effect on cartilage and may lead to arthritis which can cause pain and stiffness of the immobilized joint."[6] (Limbird Aff. ¶¶ 4(I)-(J), Ex. 1 to English 56.1(b).) Records from the UIC follow-up visits show, however, that Plaintiff had full dorsiflexion[7] and a CT scan showed that the fibula fracture in his ankle had healed. (Ghosh 56.1 ¶ 19.) Plaintiff claims that, at his last appointment at UIC on August 11, 2003, the UIC doctor recommended that he return in three months and undergo corrective surgery. (English 56.1(b) at 28.) Plaintiff's expert asserts that arthroscopic surgery is in fact the "current accepted best treatment for pain and stiffness suffered after a break and prolonged immobilization." (Limbird Aff. ¶ 4(K), Ex. 1 to English 56.1(b).) In any event, the doctor's notes from that appointment make no reference to surgery, but do show that the doctor recommended he return in three months. (Ex. 4 to English 56.1(b).) Ghosh approved that recommendation. (*Id.*)

On October 29, 2003, just before the three-month period recommended by UIC doctors for Plaintiff's next appointment had lapsed, Plaintiff was transferred to Menard. (Ghosh 56.1 ¶ 21.) As medical director at Stateville, Ghosh was responsible for, at a minimum, determining whether Plaintiff had any procedures or treatments scheduled that would require that a "medical hold" be placed on Plaintiff's transfer. (Ghosh Resp. to Pl.'s Statement of Material Facts ¶ 23.) A medical hold would have prevented Plaintiff's transfer to Menard until after any pending treatment was administered. (*Id.*) On October 14, 2003, Ghosh "reviewed the plaintiff's medical chart and determined there was no pending medical procedures or treatment scheduled for plaintiff at UIC, and therefore, no reason for a medical hold . . . ." (Ghosh Aff. ¶ 11, Ex. D to Ghosh 56.1.)

---

[6] Dr. Limbird, Chief of Orthopedic Surgery at Meharry Medical College in Nashville, Tennessee, did not personally examine Plaintiff, and his conclusions about Plaintiff's condition are based on his review of Plaintiff's medical file. (Limbird Aff. ¶¶ 2, 4, Ex. 1 to English 56.1(b).)

[7] Dorsiflexion is the movement of the foot upwards toward the leg. *Merriam-Webster's Medical Dictionary* (2008), http://medical.merriam-webster.com/medical/dorsiflexion.

Plaintiff was examined by the medical director at Menard, Defendant Dr. Ahmed, upon his transfer. (Feinerman 56.1 ¶¶ 2, 5.) Ahmed's notes from the examination show that he found that Plaintiff's ankle was fully weight-bearing and that physical therapy was no longer needed. (Ex. 7 to English 56.1(b).) Dr. Ahmed therefore discontinued the use of Plaintiff's ankle brace and declined to place Plaintiff in physical therapy. (*Id.*) Plaintiff has not returned to UIC since his transfer to Menard, nor did he meet with Ahmed again after the initial examination. (English 56.1(b) at 28; Feinerman 56.1 ¶ 10.) Within a week of his transfer to Menard, Plaintiff filed a grievance with his counselor regarding continuing pain in his ankle, but did not receive a response. (English 56.1(b) at 28.) Plaintiff alleges that he continues to suffer pain in his left ankle and that walking without the brace causes him to overextend the ankle, causing additional pain. (Pl.'s 2d Am. Compl. ¶ 23.)

Defendant Dr. Feinerman assumed the duties of medical director at Menard at some point (the parties do not specify when) prior to when Plaintiff filed his second amended complaint. (Feinerman ¶ 3.) Plaintiff's claim against Feinerman is apparently based upon Feinerman's failure to schedule an outside appointment for Plaintiff even though he had access to Plaintiff's medical records. (Feinerman Resp. to Pl.'s Statement of Material Facts ¶ 27.)

## **DISCUSSION**

**I.   Standard of Review**

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In determining whether a genuine issue of material fact exists, a court will view the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *See, e.g.*, *Springer v. Durflinger*, 518 F.3d 479, 483-84 (7th Cir. 2008). Nonetheless, the nonmoving party must present evidence to support its position and not rely merely on its own assertions and speculation "to

manufacture a genuine issue of fact." *Id.* at 484 (quoting *Amadio v. Ford Motor Co.*, 238 F.3d 919, 927 (7th Cir. 2001)).  A "genuine issue" is raised when a reasonable factfinder could find in favor of the nonmoving party on that issue.  *Hottenroth v. Slinger*, 388 F.3d 1015, 1027 (7th Cir. 2004).  If, after drawing all reasonable inferences in the nonmoving party's favor, no reasonable factfinder could find in favor of the nonmoving party as to an element that party will be required to prove at trial, summary judgment is appropriate.  *Id.*  (citing *Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1996)).

## II.     Plaintiff's Deliberate Indifference Claim[8]

Plaintiff claims that Defendants violated his right to be free from cruel and unusual punishment by neglecting his medical needs while he was incarcerated at Stateville and Menard.  *See* U.S. Const. amend. VIII. Plaintiff's single-count complaint, charging a violation of his civil rights under 42 U.S.C. § 1983, can fairly be read to allege three separate violations.  First, Plaintiff claims that Stateville personnel were deliberately indifferent in failing to remove his cast before November 2002. (English's Opp'n at 8.)  Second, Plaintiff charges both Stateville and Menard personnel with deliberate indifference for failing to take him back to UIC following his August 11, 2003 follow-up, despite Plaintiff's alleged need for corrective surgery.  (*Id.* at 9.)  Finally, Plaintiff alleges that the decision of Dr. Ahmed to discontinue use of the ankle brace and his refusal to resume Plaintiff's physical therapy have also contributed to his ongoing pain.  (*Id.* at 15.)

The Constitution requires that the government "provide medical care for those whom it is punishing by incarceration."  *Estelle v. Gamble*, 427 U.S. 97, 103 (1976).  For a court to impose liability under § 1983 against prison officials for a failure to provide the necessary medical care, the plaintiff must show that the state officials demonstrated "deliberate indifference to [his] serious

---

[8]     Because, as explained here, the court grants summary judgment to Defendants on the merits of Plaintiff's deliberate indifference claim, the court does not reach the alternative argument that Plaintiff failed to exhaust administrative remedies.

7

medical needs . . . ." *Id.* at 104; *see also Gutierrez v. Peters*, 111 F.3d 1364, 1369 (7th Cir. 1997). This standard contains both an objective and a subjective component. First, the plaintiff must establish that the medical need was objectively serious. *See Gutierrez*, 111 F.3d at 1369; *see also Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir. 1996) (deliberately ignoring a request for medical assistance is a violation if the injury is painful enough "to make the refusal of assistance uncivilized"). Defendants have not challenged Plaintiff's claim that his medical need was objectively serious, and Plaintiff has presented evidence that he continues to suffer pain in his ankle that one could reasonably infer was caused by the Defendants' alleged misconduct in his treatment. (English's Opp'n. at 7-9.) Plaintiff has therefore established the existence of a genuine issue of material fact as to the seriousness of his injury.

The second element a plaintiff must establish is that the defendant acted with "deliberate indifference" to plaintiff's medical needs. *Estelle*, 429 U.S. at 104. The test for deliberate indifference is a subjective one that requires that the defendant both "know[] of and disregard[] an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Mere negligence on the part of prison personnel does not satisfy this high standard, *Estelle*, 429 U.S. at 106, nor does refusal to provide a specific treatment. *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997). Rather, a prison official "must act or fail to act despite his knowledge of a substantial risk of serious harm." *Walker v. Peters*, 233 F.3d 494, 499 (7th Cir. 2000).

In addition to these two elements, the defendant must also be personally responsible for the alleged violation. *See Johnson v. Snyder*, 444 F.3d 579, 583 (7th Cir. 2006) (director of state Department of Corrections not personally responsible for prison officials' failure to provide amputee prisoner with a crutch and other accommodations). The principle of *respondeat superior* does not apply to § 1983 actions. A supervisor may, nevertheless, be held personally responsible for a violation of a prisoner's rights, but only if she ordered the deprivation or if it occurred with her "knowledge and consent." *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995) (prison

8

superintendent may have had knowledge of denial of legal writing materials to inmates and consented to that denial, "at least to the level of turning a blind eye" (internal quotation omitted)). In other words, a causal link between the defendant's actions and the plaintiff's injury is required for recovery in a § 1983 claim. *Id.*

### A. Defendants were not deliberately indifferent in failing to remove Plaintiff's cast.

As HCU Administrator at Stateville in 2002, Defendant Miller lacked the personal responsibility required to establish § 1983 liability because there is no evidence that she knew about or consented to the failure to remove Plaintiff's cast in a timely fashion. Plaintiff's allegations against Miller appear to be predicated on his claim that Miller knew of his situation in her role as head of a small unit, and had control over his situation in that her decisions as HCU Administrator "had a great effect on Plaintiff's medical treatment." (English 56.1(b) at 20.) Miller made rounds in the infirmary when Plaintiff was there, she monitored health and safety, and she performed such tasks as determining which inmates were present. (Miller's Resp. to Pl.'s Statement of Material Facts ¶ 4.) Plaintiff has not, however, produced evidence to suggest that her role was anything other than administrative. Her supervision of the medical technicians who, according to Plaintiff, were told about the need for his cast to be removed, was likewise administrative in nature: she handled such issues as monitoring the time allotted for breaks, responding to union questions, and responding to complaints about a hostile work environment. (Miller Dep. 8:22-24, Ex. B to Miller 56.1.) Plaintiff's evidence does not even establish the existence of a genuine issue as to Miller's knowledge of his situation; her general administrative supervision of the HCU and the med techs, absent other evidence, does not reasonably give rise to an inference that she had knowledge that Plaintiff's cast was overdue for removal. Moreover, even if a genuine issue existed as to her knowledge of Plaintiff's condition, her lack of authority over medical decisions defeats any effort to hold her liable for Plaintiff's continued wearing of a cast.

9

Plaintiff claims that a genuine issue of material fact exists regarding whether Miller had authority over at least some medical decisions. On the day his cast was removed, Plaintiff asserts that Miller ordered the med techs to check whether other inmates needed casts removed. (English 56.1(b) at 27.) Putting aside concerns about whether Plaintiff has foundation to testify concerning Miller's role in directing the inspection of other prisoners, this evidence would not create a dispute of fact because it would not establish that Miller knew about and consented to Plaintiff's being kept in a cast or that she generally possessed the authority to order casts removed. If anything, Miller's interest in determining whether other inmates had been kept in a cast for too long is inconsistent with Plaintiff's contention that Miller actively consented to Plaintiff's being kept in a cast for longer than necessary and suggests, instead, that his situation was the product of an oversight.

Plaintiff's reliance on *Duncan v. Duckworth*, 644 F.2d 653 (7th Cir. 1981), is misplaced. In *Duncan*, a *pro se* plaintiff brought a § 1983 action against the prison hospital administrator for the hospital's failure to perform surgery on his fractured wrist for nearly two years. *Id.* at 654. In denying the administrator's motion to dismiss, the court emphasized both that pleadings by a *pro se* plaintiff are construed liberally and that the plaintiff has a low hurdle to overcome a motion to dismiss under Rule 12(b)(6). *Id.* at 655. Plaintiff here, however, is represented by counsel and is responding to a motion for summary judgment. At this stage, he bears the burden of presenting evidence that creates a genuine dispute of material fact regarding his claims of deliberate indifference. Significantly, the *Duncan* court emphasized the practical benefit to keeping the administrator in the case at such an early stage: even if the administrator were ultimately found not responsible for the oversight in treatment, he would, during the course of discovery, be able to identify those who were responsible. *Id.* at 655-56. This rationale, too, is insufficient here. Defendants' motions for summary judgment followed lengthy discovery, during which Plaintiff could have learned the identity of anyone who may have been more directly responsible for his injury, such as the med techs who allegedly ignored his requests to be placed on sick call. As Miller

possessed neither the requisite knowledge of Plaintiff's condition nor the control over his condition, she cannot be personally responsible for injuries caused by the extenuated time Plaintiff spent in the cast  See *Vance v. Peters*, 97 F.3d 987, 994 (7th Cir. 1996) (dismissing § 1983 claim because prison administrators were not "sufficiently informed of the situation to require their intervention").

For similar reasons, Dr. Ngu also was not personally responsible for any oversight of Plaintiff's medical needs while he remained in a cast. Ngu saw Plaintiff when he was recovering in the Stateville infirmary, but did not see Plaintiff from the end of July 2002 through November 2002. Plaintiff claims in his response that Ngu may have in fact seen him during that time period (English's Opp'n. at 12), but provides no corroborating evidence, and in fact Plaintiff testified in his deposition that he did not have contact with Ngu. (English Dep. 41:14-16, Ex. K to Ghosh 56.1.) Plaintiff's bald assertion, "unsupported by specific facts made in affidavits opposing a motion for summary judgment," is insufficient to withstand a motion for summary judgment. *Thomas v. Christ Hosp. Med. Ctr.*, 328 F.3d 890, 894 (7th Cir. 2003).  Ngu's limited contact with Plaintiff in the Stateville HCU, followed by four months without any contact, defeats any effort to establish that he had the level of knowledge and control necessary for personal responsibility.[9]

Dr. Smith may meet the knowledge and consent standard required to impose liability under § 1983, but his conduct does not rise to the level of deliberate indifference.  Plaintiff claims that

---

[9]  Plaintiff asserts in his response to Defendants' motions that he has requested and subpoenaed the sick call log, but it has not been produced. (English's Opp'n. 12.)  The log could potentially show Plaintiff's name and call into question the credibility of Dr. Ngu's assertion that he had no knowledge that Plaintiff remained in a cast. This court need not consider what this evidence might show, however, because the assertion, in Plaintiff's response brief, that the request was made does not appear in the evidentiary record.  See *Springer*, 518 F.3d at 484 ("[S]peculation may not be used to manufacture a genuine issue of fact." (quoting *Amadio v. Ford Motor Co.*, 238 F.3d 919, 927 (7th Cir. 2001)).  Furthermore, Plaintiff did not move to compel production of the sick call log and cannot now avoid summary judgment on the basis of what the allegedly subpoenaed evidence might prove.  See *Reflectone, Inc. v. Farrand Optical Co.*, 862 F.2d 841, 844 (11th Cir. 1989) ("Courts cannot read minds, thus it is only proper that the party opposing the motion for summary judgment bears the burden of calling to the district court's attention any outstanding discovery." (internal quotation omitted)).

Smith was deliberately indifferent because he knew Plaintiff's ankle was in a cast when he signed the July 16, 2002 form approving a follow-up appointment for Plaintiff in three weeks to determine whether the cast should come off, but never filed a form with the medical records department to schedule the follow-up appointment. Even assuming that Smith was required to submit an additional form–an assertion disputed by Smith–his negligence in failing to do so does not meet the high burden of showing deliberate indifference. *See Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006) ("[E]ven admitted medical malpractice does not give rise to a constitutional violation."). Deliberate indifference requires the doctor to actually know of and disregard a substantial risk to the inmate's health. *Farmer*, 511 U.S. at 837. Plaintiff here has not presented evidence that could create a reasonable inference that Smith knew that Plaintiff remained in his ankle cast and that Smith consciously chose not to remove it. Smith did not even see Plaintiff during that four-month period. The evidence presented by Plaintiff supports at most an inference that Smith agreed that Plaintiff should return to UIC in early August 2002, but that he negligently forgot to submit the necessary paperwork. Since no reasonable jury could infer from the evidence that Smith knew of and consciously disregarded the risk to the Plaintiff of keeping his ankle in a cast through November 2002, Plaintiff's claim that Smith was deliberately indifferent fails.

### B. Defendants' failure to return Plaintiff to UIC for follow-up does not constitute deliberate indifference.

Plaintiff also alleges that personnel at the two prisons violated his constitutional rights by failing to take him back to UIC for follow-up appointments in 2003 and 2004. By the time Defendant Dr. Ghosh assumed the duties of Medical Director at Stateville in May 2003, Plaintiff had resumed his visits to UIC. At Plaintiff's last visit to UIC, on August 11, 2003, Ghosh approved the recommendation that he should return in another three months. (Ex. 4 to English 56.1(b).) Although Plaintiff claims that the doctor at UIC told him he needed corrective surgery at that time, the form completed by the UIC doctor makes no reference to such a recommendation. (*Id.*) Plaintiff

12

contends that Ghosh was deliberately indifferent to Plaintiff's serious medical need in that he approved Plaintiff's transfer to Menard prior to his follow-up appointment at UIC, "consciously [choosing] to disregard a nurse or doctor's directions in the face of medical risks." *Cf. Zentmyer v. Kendall County*, 220 F.3d 805, 812 (7th Cir. 2000) (holding that prison officials were not liable when they failed to administer medicine to plaintiff on several occasions).

The court disagrees. Ghosh could not be said to have disregarded a doctor's directions when he allowed Plaintiff's transfer to Menard to go forward because the UIC doctor made no indication on the "Request for Consultation" form that the follow-up was for surgery or any other medically important procedure. (Ex. 4 to English 56.1(b).) Indeed, Plaintiff does not even claim in his 56.1(b) statement or in his complaint that Ghosh had knowledge of the UIC doctor's alleged surgery recommendation. (English 56.1(b) at 28.) The follow-up instead appeared to be quite routine, and the fact that the follow-up was recommended to take place in three months rather than earlier further suggests that Ghosh had no notice that any serious procedure was planned. Ghosh's determination that Plaintiff had no pending medical treatments scheduled at UIC and no other basis for delaying his transfer to Menard thus did not constitute deliberate indifference to any serious medical risk.

Dr. Ahmed's failure to schedule any follow-up appointments at UIC or elsewhere after Plaintiff's transfer to Menard also does not establish deliberate indifference. Other than Plaintiff's unsupported assertion, there is no evidence that the UIC doctors actually recommended surgery. According to Plaintiff's expert, Dr. Limbird, arthroscopic surgery is currently regarded as the best practice for addressing the kind of pain that Plaintiff is experiencing. (Limbird Aff. ¶ 4(K), Ex. 1 to English 56.1(b).) A prison official does not violate a prisoner's rights merely by failing to provide the best available procedures, however. *See Forbes*, 112 F.3d at 266. Limbird did not state, and Plaintiff does not claim, that Ahmed's denial of surgery was "so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment," *Norfleet*,

439 F.3d at 396, and thus Limbird's opinion does not establish that Ahmed was deliberately indifferent to his medical needs.

For the same reasons, Dr. Feinerman's failure to send Plaintiff to UIC when he was medical director at Menard cannot constitute deliberate indifference. In any event, Plaintiff does not even allege that Feinerman had knowledge of his condition prior to his filing suit. (English's Opp'n. at 16.) Without knowledge of Plaintiff's condition during the relevant time period, Dr. Feinerman cannot be personally responsible for any failure to provide Plaintiff with follow-up appointments at UIC and thus is not liable under § 1983.

### C. Dr. Ahmed's decisions do not constitute deliberate indifference.

Finally, Plaintiff claims that upon his transfer to Menard, Ahmed's decision to remove his ankle brace and not resume his physical therapy sessions constituted deliberate indifference to his serious medical needs. Ahmed's notes from his one examination of Plaintiff show that he took into account Plaintiff's condition and his request for an ankle brace and surgery. (Ex. 4 to English 56.1(b).) Ahmed found that the ankle was non-tender, that it was fully weight-bearing, and that there was no swelling or edema. (*Id.*) Based on these findings, he concluded that the ankle brace was no longer needed and that there was no need to resume physical therapy. Dr. Limbird's declaration that surgery is the "current accepted best treatment" appears to establish a difference of opinion concerning Plaintiff's medical condition. (Limbird Aff. ¶ 4(K), Ex. 1 to English 56.1(b).). A mere difference of professional opinion does not, however, show that a doctor was deliberately indifferent to a prisoner's needs. *See Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996) (different opinion by plaintiff's expert regarding whether plaintiff was a suicide risk does not establish that defendant doctor was deliberately indifferent). Again, Plaintiff has not suggested that Dr. Ahmed's conclusions were "so far afield of accepted professional standards as to raise the inference that [they were] not actually based on a medical judgment," *Norfleet*, 439 F.3d at 396. Instead, "[w]hat we have here is not deliberate indifference to a serious medical need, but a

deliberate decision by a doctor to treat a medical need in a particular manner." *Jackson v. Kotter*, ___ F.3d ___, No. 06-1922, 2008 WL 4053034, at *9 (7th Cir. Sept. 2, 2008) (quoting *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996)). Summary judgment is therefore appropriate because Plaintiff's evidence does not create a genuine issue of material fact as to Dr. Ahmed's deliberate indifference towards Plaintiff.

## **CONCLUSION**

For the reasons stated above, all Defendants' motions for summary judgment [121, 126, 130] are granted.

ENTER:

Dated: September 15, 2008

_____
REBECCA R. PALLMEYER
United States District Judge

15